**Agnes C. Roth, Administratrix of Estate of Herman F. Roth, Deceased, Appellant, v. Albert A. Schaefer et al., Appellees.**

**Gen. No. 40,489.**

Opinion filed May 22, 1939. Rehearing denied June 6, 1939.

CHARLES C. SPENCER and RICHARD M. SPENCER, both of Chicago, for appellant.

OTTO M. HAMER and C. C. CUNNINGHAM, both of Chicago, for appellees; CHESTER D. KERN, of Chicago, of counsel.

MR. JUSTICE O'CONNOR delivered the opinion of the court.

Herman F. Roth brought an action to recover damages for personal injuries claimed to have been sustained by him March 11, 1936, through the alleged negligence of defendants in maintaining an elevator in a building owned and managed by them. Pending the suit Roth died and his administratrix was substituted as plaintiff. At the close of plaintiff's case the court directed a verdict for defendants. One of the jurors refused to sign the verdict. The court, however, treated the verdict as returned according to his instruction. Judgment was entered in favor of defendants and plaintiff appeals.

The record discloses that defendants owned a five-story building at the southwest corner of Randolph and Green streets, Chicago, which was occupied by a number of tenants. They also owned another building on the east side of Green street a short distance north of Randolph street, in which Herman Roth and his brother Bernhard, as tenants of defendants, conducted a blacksmith shop for many years. Near the center of the five-story building defendants maintained an elevator used principally for carrying freight to the tenants on the several floors. Persons bringing in or taking out goods also used the elevator in the transacting of their business and there is some evidence that it was also used by other persons having business in the building.

There is evidence to the effect that about 3:30 o'clock p. m. March 11, 1936, Herman Roth left his blacksmith shop, went to the five-story building apparently to see Mike Thomas, who was employed by defendants and who maintained a shop in the southeast corner of the basement of the five-story building. The evidence indicates that Thomas was an engineer and a sort of ''handy-man'' about the building, looking after some of the wants of tenants; that about 15 or 20 minutes after Roth left his blacksmith shop he was found in the basement where he apparently

had fallen from the first floor, the elevator evidently at that time being at one of the upper floors. He was severely injured and was taken to a hospital where he was found to have sustained 13 bone fractures; he remained at the hospital 9 weeks; he was afterward taken home and died April 4, 1937, of causes not connected with the accident.

The evidence further tends to show that some time prior to the accident the Roth brothers took their acetylene torch to the five-story building and cut some steel rods for defendants, and were paid for the work; that on another occasion they took their washing machine to the shop in the basement for repairs; that on the day before the accident the Roths were having trouble with an electric motor they used in their blacksmith shop, and at their request Thomas went to the blacksmith shop to see what was wrong and try to remedy it; he got the motor from Herman Roth and took it from the blacksmith shop to his shop in the basement, keeping it until the following day; he took the motor apart but could not repair it; that on March 11 between 9 and 9:30 o'clock a. m., he took the motor back to the blacksmith shop and suggested that the Roths test it out on their direct current, as the current in the basement was alternating. Thomas further testified that he did not say anything to Roth about calling on him again in connection with the motor; that he did the work as a favor to the Roths; that defendants had nothing to do with the matter, and that the Roths paid no one for what he, Thomas, did.

The evidence further shows there was a passenger elevator in the building located in the front or Green street part of the building which ran only from the first to the upper floors—not into the basement; 2 doors led to the basement from the Green street side but these doors were always locked so no one could get into the basement from the Green street side. An alley extended from Green street west along the south

side of the building, then north in the rear of the building, then west to Peoria street, the next street west, and this seems to have been a private alley. The five-story building faced 150 feet on Green street and 75 feet on Randolph street; there was a loading platform at the west of the building about the height of the floor of a motor truck, where goods were loaded and unloaded for tenants of the building. The elevator was near the center of the building; the shaft was about 12 feet square. There is a conflict in the evidence as to whether there were steps leading from the alley to the top of the platform at the time of the accident; a door opened into the building from the platform and to reach the elevator one had to go east between two walls about 18 feet apart; a sliding door was in the east end of this room which led into another room of a somewhat similar character; on the east and west of the elevator were doors which worked independently; they opened in the middle by pushing the one down and the other would rise; if this were done and the elevator was not at the first floor, the person desiring to use the elevator would call, and if no one was using the elevator would pull a rope until the elevator came to the level of the first floor; the person who used the elevator operated it.

There is no direct evidence as to how Herman Roth entered the building or how he came to fall into the elevator shaft, he being dead at the time of the trial. He was heard moaning in the basement by men using the elevator 15 or 20 minutes after he left his blacksmith shop. There is some evidence to the effect that a light was near the west entrance of the elevator which was sometimes out of repair; but whether it was lit at the time Roth approached the elevator and whether the doors to the elevator were open, are matters of conjecture.

Plaintiff contends that the complaint alleges and the evidence proves a number of acts of negligence.

The principal act of negligence relied on is that defendants allowed the elevator shaft to be open, unprotected and unguarded, which was a violation of defendants' common-law duty and a violation of a city ordinance requiring such elevator shafts to be safely protected and the doors of the elevator kept closed.

In a case based on defendants' claimed negligence it is not necessary that the evidence demonstrate such negligence, ''but responsibility for the accident must be determined upon the reasonable conclusions to be drawn from the evidence.'' *Denny Bros. v. Goldblatt*, 298 Ill. App. 325; *Union Pacific R. R. Co. v. Huxoll*, 245 U. S. 535. In the instant case, the jury having been instructed to return a verdict in favor of defendants, the rule of law is that the evidence must be viewed in its aspect most favorable to plaintiff, together with all reasonable inferences. The question on such a motion is, Is there any evidence fairly tending to prove the allegations of the complaint? *Libby, McNeill & Libby v. Cook*, 222 Ill. 206; *Thomason v. Chicago Motor C. Co.*, 292 Ill. App. 104.

We think Roth was entitled to the protection of the provisions of the ordinance, and for the purpose of this decision we shall assume without deciding that defendants violated their common-law duty and the ordinance as contended by plaintiff, but we are clear that the verdict was properly directed. At most, Herman Roth prior to and at the time of the accident was a licensee. He was in the premises for purposes of his own, and in such case there is no liability on defendants except not to knowingly and wilfully injure him. *Milauskis v. Terminal R. R. Assoc.*, 286 Ill. 547; *Pauckner v. Wakem*, 231 Ill. 276; *Mallory v. Day Carpet & Furniture Co.*, 245 Ill. App. 465; *Bandosz v. Daigger & Co.*, 255 Ill. App. 494. The evidence shows that Roth wanted Mike Thomas, who was employed by defendants as above stated, to help him fix Roth's motor and that Thomas attempted to do this as a favor, a neigh-

borly act, without compensation; what he did was not a part of his duties as an employee of defendants and there is no evidence that defendants knew anything about it.

The *Milauskis* case, 286 Ill. 547, was an action to recover for personal injuries where plaintiff was injured when walking along a beaten path at the side of railroad tracks. The court in discussing the question of liability to an invitee or a licensee said (p. 555): "The distinction between a visitor who is a mere licensee and one who is on the premises by invitation turns largely on the nature of the business that brings him there rather than on the words or acts of the owner which preceded his coming. Permission involves leave and license but it gives no right. The permission or license is a justification for his entry, and while he is not technically a trespasser, yet the duty of the owner to guard him against injury is governed by the rules applicable to trespassers. 'The duty to one who comes thereon by the owner's invitation to transact business in which the parties are mutually interested is to exercise reasonable care for his safety while on that portion of the premises required for the purpose of his visit. Under such circumstances the party is said to be on the premises by implied invitation of the owner.' (*Pauckner v. Wakem*, 231 Ill. 276.) If a person is upon the premises of the owner by invitation, expressed or implied, and not by mere permission, then such owner owes him a duty to exercise ordinary care to keep the premises in a reasonably safe condition. (*Purtell v. Philadelphia Coal Co.*, 256 Ill. 110.) 'To come under an implied invitation as distinguished from a mere license, the visitor must come for a purpose connected with the business in which the occupant is engaged or which he permits to be carried on there. There must be at least some mutuality of interest in the subject to which the visitor's business relates.' "

In the instant case Roth, at the time of the accident, was on the premises as a licensee on business of his own, and there is no contention that defendants knowingly or wilfully injured him. Counsel for plaintiff cite and principally rely upon *Parker v. Barnard,* 135 Mass. 116; *Racine v. Morris,* 201 N. Y. 240; *Drake v. Fenton,* 237 Penn. 8; *Brandosz v. Daigger & Co.,* 255 Ill. App. 494, none of which is in point. In the *Parker* and *Racine* cases a police officer was in the discharge of his duties when he entered the premises and was injured. In the *Drake* case the injured person was a fireman of the city of Philadelphia and in the performance of his duty; he entered at night a storage warehouse owned and occupied by defendant, for the purpose of extinguishing a fire. In the *Brandosz* case a fireman of the city of Chicago was injured in the discharge of his duties; he had entered defendant's premises to extinguish a fire. It is obvious that the facts in these cases are not analogous to the facts in the instant case, where Roth, the injured man, was in defendants' premises solely on business of his own.

Whether, as directed by the court, the verdict was legal though not signed by one of the jurors, is, we think, of no importance since we hold that defendants are not liable for the unfortunate accident.

The judgment of the superior court of Cook county is affirmed.

*Judgment affirmed.*

McSurely, P. J., and Matchett, J., concur.